IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| AMERICAN TRAFFIC SAFETY SERVICES ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:11cv23 |
| SAM SCHWARTZ ENGINEERING PLLC | ) ) ) | |
| Defendant. | ) | |

## **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on plaintiff American Traffic Safety Services Association's ("Plaintiff" or "ATSSA") Motion to Dismiss Count III [20] of defendant Sam Schwartz Engineering PLLC's ("Defendant") Amended Counterclaim [Dkt. 18 ("AC").]  For the following reasons, the Court will grant Plaintiff's Motion.

### **I. Background**

The allegations in the Counterclaim are as follows. Plaintiff is a trade association based in Fredericksburg, Virginia, and Defendant is a New York corporation based in New York City.  (AC ¶¶ 1, 2.)

"Pedestrian Traffic Management" and "Pedestrian Management" are terms referring to systems for improving

1

pedestrian control, access, and safety. (AC ¶ 3.) Defendant has been a provider of these services since at least 2002. (AC ¶ 4.)

Defendant conceived of the concept of "Pedestrian Managers" in November 2007 and has trained Pedestrian Managers for public and private entities ever since. (AC ¶¶ 5, 6.)

Defendant approached Plaintiff on January 21, 2010, proposing that they discuss Defendant's ideas regarding Pedestrian Traffic Management, specifically relating to a certification program and training materials for pedestrian traffic management. (AC ¶¶ 7, 8; Complaint [Dkt. 1] ¶ 14; Answer [Dkt. 18] ¶ 14.) Plaintiff was unaware of the concept of "Pedestrian Managers" at that time. (AC ¶ 9.)

On May 5, 2010, the parties entered into an agreement entitled "Pedestrian Manager Training Course Agreement" (the "Agreement"). (AC ¶ 10.) The Agreement obligated Defendant to do the following:

1) develop a pedestrian manager training course;
2) develop a power point presentation for the course;
3) assist Plaintiff with a marketing strategy for the program;
4) encourage city and state departments of transportation to require Pedestrian Management for urban construction projects; and
5) provide a module entitled "Maintenance and Protection of Traffic."

(AC ¶ 11.)

The Agreement likewise required that Plaintiff do the following:

1) provide Master Instructors to review course content;

2) develop a Train-the-Trainer program;

3) obtain certification of the course from Plaintiff's Certification Board;

4) give Defendant exclusive rights to provide the Course for a 3-year period in New York, New Jersey, Connecticut, Pennsylvania, Virginia, Washington, District of Columbia, Maryland, Florida, and Illinois;

5) provide certification cards to Defendant's employees trained as Pedestrian Managers; and

6) provide "Pedestrian Manager Kits" for Defendant to purchase for each Pedestrian Manager taught.

(AC ¶ 12.)

A document entitled "Pedestrian Manager Training Course Training Lesson Plan" (the "Lesson Plan") was attached to the Agreement. (AC ¶ 13.) Among other things, the Lesson Plan outlined the training course's presentation and certification requirements. (AC ¶ 14.)

On May 17, 2010, Donna Clark, a Senior Vice President for Plaintiff, emailed Janet Campbell, a Vice President for Defendant, informing Defendant that Plaintiff had approved the Pedestrian Management Certification program. (AC ¶¶ 15, 16.)

3

On May 27, 2010, Ms. Clark emailed Ms. Campbell informing her that Plaintiff was working on instructor notes, exams, and training materials. (AC ¶ 17.)

On June 7, 2010, Ms. Clark informed Summit Security, a company that had requested pedestrian management training, that the certification course "probably won't be ready . . . until the fall. (AC ¶ 18.) Ms. Clark advised that they "contact our partner Sam Shwartz [sic]" if they needed immediate training. *Id.*

On August 18, 2010, Ms. Campbell emailed Ms. Clark stating that the course would be ready by November or December 2010. (AC ¶ 19.) That same day, Lisa Deyo, Plaintiff's Associate Director of Training and Products, emailed Defendant stating that the course "is scheduled to be offered this fall/winter." (AC ¶ 20.)

On September 9, 2010, Ms. Deyo emailed Defendant requesting Pedestrian Management for a firm called Allied Barton. (AC ¶ 21.)

On September 17, 2010, Sam Schwartz, Defendant's CEO, emailed Roger Wentz, Plaintiff's CEO, informing Mr. Wentz that Defendant had begun preparations for the course as agreed. (AC ¶¶ 22, 23.) Attached to that email was an email from Rob Phillips, Defendant's COO, to Ms. Deyo, listing items Defendant needed to complete preparations for the course. (AC ¶ 24.)

Plaintiff did not respond, did not provide such items, and did not supply certification cards to Defendant's employees who had passed the course. (AC ¶¶ 25, 26.)

On September 19, 2010, Mr. Phillips emailed Ms. Deyo confirming Defendant's willingness to train any company, but expressing concern about Plaintiff's alleged intention to compromise the integrity of the class to achieve a faster delivery of certifications. (AC ¶ 27.)

On November 15, 2010, Ms. Campbell, Ms. Deyo, and Ms. Clark held a conference call on which they discussed the following:

1) Plaintiff's demand that the parties' agreement be voided;

2) Defendant's desire not to void the agreement and to work with Plaintiff going forward; and

3) Defendant's claim to own the service mark for "Pedestrian Managers," which Plaintiff could not use without Defendant's permission.

(AC ¶ 28.) The call ended without resolution of Plaintiff's demand to void the agreement. *Id.*

Defendant claims to have performed all of its obligations under the Agreement except for those that required certain necessary information from Plaintiff. (AC ¶ 29.) Defendant claims that it remains ready and willing to train any company identified by Plaintiff. (AC ¶ 30.)

5

Meanwhile, Defendant claims that Plaintiff has failed to uphold its obligation to do the following from the Agreement:

1) review course content;

2) develop the Train-the-Trainer program;

3) give Defendant the exclusive right to present the program in the jurisdictions identified in the agreement;

4) update the course;

5) provide certification cards to Defendant's employees that complete training;

6) provide Pedestrian Manager Kits; and

7) to otherwise perform under the Agreement.

(AC ¶ 31.)

Moreover, Defendant claims that it had a contract with the Port Authority of New York and New Jersey (the "Port Authority") to provide Pedestrian Management Services. (AC ¶ 42.) This was a bid contract and was being re-bid in the normal course of the Port Authority's operations. (AC ¶ 44.) Defendant submitted a timely bid of $9,918,648.32 in the hopes of continuing its business relationship with the Port Authority. (AC ¶¶ 45, 46.)

The Port Authority requires that its providers of Pedestrian Management Services have prior law enforcement experience or its equivalent, and each employee providing such services had to be certified as qualified. (AC ¶ 48.)

Allied Barton's bid ultimately won with a bid below Defendant's, but when it made the bid, its employees were not so certified--a fact about which the Port Authority was unaware. (AC ¶¶ 50, 51, 52.)

Plaintiff assisted Allied Barton in preparing its bid because it stood to gain financially if Allied Barton won the contract. (AC ¶¶ 53, 54.)

Plaintiff knew at the time it assisted Allied Barton that Allied Barton's employees were not qualified as required by the Port Authority, and it knew that the Port Authority was unaware of this. (AC ¶¶ 55, 56.) Had the Port Authority known this, it would not have awarded the contract to Allied Barton, and would instead have chosen Defendant. (AC ¶¶ 57, 58.)

Plaintiff trained Allied Barton employees after Allied Barton won the contract and received financial gain from doing so. (AC ¶¶ 59, 60.) The Port Authority was not told of the timing of this training and would have vacated the award and gone with Defendant had it known. (AC ¶¶ 61, 62.) Plaintiff conspired with Allied Barton for the sole purpose of harming Defendant and did so using wrongful means, including fraud by omission. (AC ¶¶ 63, 64.) Defendant's business relationship with the Port Authority was injured as a result because its prior business relationship ended when the bid was awarded to Allied Barton. (AC ¶ 65.)

Plaintiff filed a motion to dismiss Count III of the Amended Counterclaim and memorandum in support on May 5, 2011. [Dkts. 20, 21 ("MTD").] Defendant filed a brief in opposition on May 16, 2011. [Dkt. 23 ("Opp.").] And Plaintiff filed a reply on May 17, 2011. [Dkt. 24 ("Reply").] Plaintiff's Motion is before the Court.

**II. Standard of Review**

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) (citation omitted). In deciding a Rule 12(b)(6) motion to dismiss, a court must first be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Thus, a court must take "the material allegations of the complaint" as admitted and liberally construe the complaint in favor of a plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citation omitted).

While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citation omitted). Indeed, the legal framework of the complaint must be supported

by factual allegations that "raise a right to relief above the speculative level." *Id.* at 1965. In its recent decision, *Ashcroft v. Iqbal*, 129 S. Ct 1937 (2009), the Supreme Court expanded upon *Twombly* by articulating the two-pronged approach to be followed in any Rule 12(b)(6) analysis. First, a court must identify and reject legal conclusions unsupported by factual allegations because they are not entitled to the presumption of truth. *Id.* at 1951. "[B]are assertions" that amount to nothing more than a "formulaic recitation of the elements" do not suffice. *Id.* (citations omitted). Second, assuming the veracity of "well-pleaded factual allegations", a court must conduct a "context-specific" analysis drawing on "its judicial experience and common sense" and determine whether the factual allegations "plausibly suggest an entitlement to relief." *Id.* at 1950-51. The plausibility standard requires more than a showing of "a sheer possibility that a defendant has acted unlawfully". *Id.* at 1949. In other words, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. Analysis

Count III of the Amended Complaint alleges Tortious Interference with Business Relationships. Plaintiff argues that Defendant fails to state such a claim under Virginia law.

9

Defendant responds that this case is governed by New York law, not Virginia law. Plaintiff replies that even if this is true, Defendant fails to state a claim under New York law.

### A. Applicable State Law

"A federal court resolving a diversity action is, absent a controlling constitutional provision or act of Congress, obliged to apply the substantive law of the state in which it sits, including the state's choice of law rules." *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 418-19 (4th Cir. 2004) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Virginia's choice of law rules, the substantive law governing tort claims is "the law of the place of the wrong." *McMillan v. McMillan*, 219 Va. 1127, 1128 (1979). "Under Virginia law, the place of the wrong or injury is the place where the injury was suffered, not where the tortious act took place." *Feely v. Total Realty Mgmt.*, 550 F. Supp. 2d 700, 713 (E.D. Va. 2009) (Lee, J.).

Here, under the facts alleged, Defendant's injury (the loss of its Port Authority contract to Allied Barton) was suffered in New York. Plaintiff raises no serious argument to the contrary, instead stating that it "does not agree that New York law applies." (Reply at 1.) Absent countervailing facts,

this Court must agree with Defendant that New York law applies here, and will therefore consider Count III under such law.

B. <u>Sufficiency of Count III</u>

In New York, the elements of tortious interference with a prospective business relationship are: (1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acting with the sole purpose of harming the plaintiff or using wrongful means, and (4) injury to the business relationship. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190-91 (N.Y. 2004). Compared with tortious interference with an *existing* contractual relationship, a claim for interference with a *prospective* relationship requires more culpable conduct by the defendant. *Id.* at 190.

i. <u>Business Relationship with a Third Party</u>

There seems to be little dispute here that Defendant alleged a business relationship with the Port Authority, as Defendant claims to have had a contract with the Port Authority before losing in the re-bidding process. (AC ¶¶ 42-46.)

ii. <u>Interference with the Business Relationship</u>

In support of interference in a business relationship, Defendant cites its allegations that Plaintiff and Allied Barton deliberately concealed from the Port Authority the fact that Allied Barton's employees were not duly certified (AC ¶¶ 51-56) *and* that this concealment resulted in Allied Barton receiving

the contract over Defendant (AC ¶¶ 57, 58). This too is sufficient and not conclusory in the sense prohibited by *Twombly* and *Iqbal*.

> iii. <u>Sole Purpose of Harming Defendant or Use of Wrongful Means</u>

Defendant argues that Plaintiff acted with the hope of profiting by training Allied Barton's employees after Allied Barton won the bid and that the purpose of this was to harm Defendant by ending its relationship with the Port Authority. (Opp. at 6.) Given that Defendant alleged that at least one of Plaintiff's purposes was "its own financial gain" (AC ¶ 54), that precludes Plaintiff's having had a sole purpose of harming defendant. Thus, the question is whether Plaintiff is alleged to have used "wrongful means" in interfering with Defendant's prospective business relationship.

Wrongful means include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (N.Y. 1980). A "defendant's conduct must amount to a crime or an independent tort." *Carvel*, 3 N.Y.3d at 190. If the latter, the plaintiff must allege (1) infliction of intentional harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an

act or series of acts that would otherwise be lawful. *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142-43 (1985).

The allegations here fall well below this level of severity. Defendant alleges, at one point, conspiracy with Allied Barton using wrongful means, including fraud by omission. (AC ¶ 64.) But this is a conclusory statement, and the facts alleged fail to back it up. Specifically, the Amended Counterclaim fails to show anyone actually communicating *anything* to the Port Authority besides perhaps the fact that a bid was made (*see* AC ¶ 51), let alone *deceiving* the Port Authority as to the nature of Allied Barton's qualifications. Rather, the allegations merely show that Plaintiff knew that the Port Authority required that employees providing Pedestrian Management Services be certified, and that Plaintiff helped Allied Barton in the hopes of training their employees if they won. (AC ¶¶ 47-56.) That is not enough to show wrongful means as required by the statute, meaning that Count III must be dismissed for failure to state a claim.

## IV. Conclusion

For the reasons stated above, the Court will grant the Motion to Dismiss Count III.

|  | /s/ |
|---|---|
| May 31, 2011 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |